UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| ANTHONY PORTER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  Case No. 1:18-cv–00139-SEP |
| | ) |
| CAPE GIRARDEAU COUNTY, et al., | ) |
| | ) |
| Defendants. | ) |

## **MEMORANDUM AND ORDER**

Before the Court is Defendants' Motion for Summary Judgment. Doc. [84]. The Motion is fully briefed and ripe for review. For the reasons set forth below, the Motion is granted.

### FACTS AND BACKGROUND

Plaintiff Anthony Porter initiated this action under 42 U.S.C. § 1983 on June 6, 2018. Doc. [1]. At all times relevant to the motion, Porter was incarcerated as a pretrial detainee at the Cape Girardeau County Jail, where the individual Defendants were employed. On March 19, 2020, Plaintiff filed an Amended Complaint, naming Cape Girardeau County as a Defendant, as well as three individuals: Todd Stevens, a Lieutenant at the Jail, and William Crites and Phillip Colyer, both of whom were Correctional Officers at the Jail. Doc. [74]. Count I alleges that Defendant Stevens used excessive force against Porter on June 12, 2017, while Defendant Crites failed to intervene. Count II alleges that Defendant Crites used excessive force against Porter, in a separate incident, also on June 12, 2017. Count III alleges that Defendant Colyer used excessive force against him on October 28, 2017. Count IV alleges that Defendant Stevens violated his right to adequate nutrition on June 12, 2017. Finally, in Count V, Plaintiff alleges that Cape Girardeau County inadequately trains its employees and has unofficial customs and practices that support the use of excessive force and inadequate nutrition.

Viewing the evidence and all reasonable inferences in the light most favorable to Plaintiff for purposes of the Motion before the Court, the record establishes the following:

Plaintiff was incarcerated in the Cape Girardeau County Jail from June 5, 2017, through December 28, 2017. Doc. [95-1] ¶ 1. Plaintiff was 24 years old at the time of his admission to the Jail, had been diagnosed with an aggression disorder, had a known history of aggressive

1

behavior,[1] and described himself as "real rambunctious." Doc. [85-9] at 1; [Doc. 88-1] at 20. Additionally, Defendant Stevens is approximately 5'5" or 5'6", while Porter is six feet tall. Doc. [88] at 28.

On June 12, 2017, at approximately 1:30 p.m., Porter complained to Defendant Stevens that his food tray had been shorted, as he had been given three tortillas, some bologna, and a side of corn, but he was missing a slot of beans. Doc. [88] ¶¶ 1-3. In response to Plaintiff's complaint, Stevens stated that Plaintiff would not receive more food and directed him back to his bunk. Doc. [95-1] ¶ 3. Porter continued to complain that his food tray was inadequate and then walked back to his bunk area under the nearby staircase and sat down with his back against the wall. *Id*. ¶ 4. Stevens then told Porter to go into the cell behind him. Doc. [88] ¶ 20. Plaintiff resisted this instruction, insisting that he would not go into the designated cell because there was already an inmate in there on the bottom bunk, and Plaintiff alleged that he needed the bottom bunk due to a seizure disorder. Doc. [85-2] at 35. Porter told Stevens that he would "not go[ ] in that room" until Stevens moved the other inmate. *Id*. Stevens advised Porter that if he did not go into the cell, he would be refusing an order, but Stevens continued to resist. Doc. [88] ¶ 23-24.[2] Stevens then warned Porter a second time that he was being ordered to go into the cell, and that if Porter did not "get back in that room" he was going to be tased. *Id*. ¶ 24; Doc. [85-2] at 35. Porter did not go in the cell, and Stevens then unholstered his taser and tased Porter in the chest.[3] Doc. [95-1] ¶ 12. Stevens then came behind Porter and placed him in a headlock,

---

[1] Plaintiff's medical history as provided to the Jail notes that Porter has a history of "noted aggression resulting in altercations", and that he is "impulsive with some aggressive behavior when provoked." Doc. 85-9, at 1.

[2] The Court notes that, in his response to Defendants' Statement of Uncontroverted Material Facts, Plaintiff denies that he refused to go into the room as ordered. *See* Doc. [88] ¶23. However, in Plaintiff's deposition, Porter, referring to this interaction with Stevens, testified that, "I told him just flat out . . . I'm not going in that room." [85-2] at 35. Porter further testified that he never went into the cell. *Id*. at 42. The fact that Plaintiff stated a reason for not going into the room does not change the fact that he was refusing to enter the cell as ordered. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

[3] The Cape Girardeau County Sheriff's Office Policy Manual addresses the use of force and tasers, indicating that "there are many situations where the suspect will not follow verbal direction from the Deputy or is actively resisting and the use of the [taser] will prevent many of these situations from escalating to higher levels, including deadly force." Doc. [88] ¶ 29. The force levels in the policy manual, from lowest force to highest, are "officer presence, verbal commands, use of taser, empty hand

causing Porter to state, "I ain't doing nothing." *Id*. ¶¶ 14-15.  Defendant Crites, who was present during the foregoing incident, proceeded to handcuff Porter.  *Id*. ¶¶ 16-17.  Stevens then used the taser to "dry stun"[4] Porter in the back.  Porter testified that one prong of the taser skimmed his finger and two prongs of the taser locked into his chest, but the record is unclear as to whether Plaintiff is asserting that he was tased yet again, or whether this is alleged to have occurred during one of the prior tasings.  Doc. [95-1] ¶¶ 19-21.  As the Court construes the facts in the light most favorable to Plaintiff, it will assume he was tased three times during this incident. Plaintiff testified that after the tasing he had marks on his chest, that he has experienced soreness, stiffness, constriction in his chest and back, and twitching, and he expects to have future medical needs related to the same.  Doc. [95-1] ¶ 23-25.  Following the above-described incident, Porter was placed in administrative segregation for a few hours.  Doc. [88] ¶ 34.

Later that same day, after being released from segregation, Porter became involved in a physical altercation with two other inmates.  Doc. [88] ¶ 35.  Porter asked one of the other inmates to give him his mattress.  Doc. [95-1] ¶ 35.  The two other inmates attacked Porter, and Porter punched both of the other detainees.  *Id*. at 36; Doc. [88] ¶ 36.  Defendant Crites entered the pod, witnessed the fight, and grabbed Porter and slammed him onto a table.  Doc. [95-1] ¶ 37.  Crites, believing that Porter had assaulted the other two inmates, removed Porter from the pod.  Doc. [88] ¶ 41.  As Crites and Porter walked away from the pod towards the old visiting area, Porter kept turning around in an attempt to talk to Crites, hoping to explain that the other detainees had attacked him first.  Doc. [95-1] ¶ 39.  Crites ordered Porter to stop turning around and to stop resisting.  Doc. [88] ¶ 39.  As Porter and Crites approached a glass door leading to the old visiting area, Crites again told Porter to stop turning around and resisting, and then pushed Porter's face against the visitation door in order to hold him still.  *Id*. ¶ 40; Doc. [88] ¶ 42.  Porter testified that being pushed against the door caused one of his teeth to be chipped and his mouth to bleed.  Doc. [95-1] ¶ 41-42.  Defendants assert that his chipped tooth and bleeding were the result of Porter's altercation with the two other detainees moments before.  Doc. [95-1] ¶ 41-42.  No one disputes that Crites pushed Porter against the door following the

---

tactics, impact weapons, and deadly force." Id. ¶ 31.  The policy manual states that the taser should be used to stop a threat, including threats to officer safety, threats to others, and threats to an inmate injuring himself.  *Id*. ¶ 32.

[4] "Dry stun" mode means that the Taser is pressed directly against the skin and produces a burning sensation.  *Bussey-Morice v. Gomez*, 587 Fed. Appx. 621, 630 (11th Cir. 2014) (unpublished).

fight with the other detainees, however, and whether that incident definitively caused the chipped tooth or not is immaterial to the Court's analysis.  After being pushed against the door, Porter again explained that he was attacked by the other two detainees and asked the staff to review the camera footage.  *Id*. ¶ 46.  It was determined that he did not initiate the fight, and Porter was removed from the visiting area and placed in a different pod.  *Id*. ¶ 47.

The incident involved in Count III occurred some months later, on October 28, 2017.  On that day, Plaintiff received a piece of meat in one his meals that he alleged was undercooked.  Doc. [88] ¶ 43.  Porter complained about the meat to a corrections officer, who asked Porter to come out of his pod to discuss it, and then went to inform the kitchen.  Doc. [95-1] ¶ 48-49.  Porter then walked out his pod carrying the meat.  *Id*.  Another corrections officer, Officer Golden, did not know that Porter had been asked to exit the pod, and believed that Porter had exited the pod without permission.  *Id*. ¶ 50.  Golden believed that Porter was "trying to escape or something," and attempted to grab Porter's arm to handcuff him.  Doc. [88] ¶¶ 45-46.  Defendant Colyer witnessed this interaction from the observation bubble and came to assist, as he believed that Porter was refusing an order from Golden.  Doc. [88] ¶ 47.  Golden told Porter that he was taking him to booking for exiting the pod without permission.  *Id*. ¶ 48.  As Golden and Porter were walking to booking, Porter leaned back to speak to Golden about where he was being taken.  Doc. [95-1] ¶ 54.  Seeing this interaction, Colyer grabbed Porter and told him to stop resisting Golden.  Doc. [88] ¶ 50.  Colyer then twice directed Porter to stop resisting, indicating that if he continued to struggle, Colyer would tase him.  *Id*. ¶ 51.  Colyer then slammed Porter to the ground, unholstered his taser, and tased Porter.  *Id*. ¶ 52.

The Count IV incident happened when Porter complained to Defendant Stevens about his shortened food tray.  As background, Plaintiff alleges that he needs a special high-calorie diet that requires him to have a certain number of calories or he will start losing weight.  Doc. [95-1] ¶ 64.  Plaintiff asserts that he requires anywhere from 4,000 to 6,000 calories per day, or approximately double the number of calories an average person needs.[5]  *Id*. ¶¶ 70.  Plaintiff informed the Jail of this purported need for extra calories per day, and Defendant Stevens was

---

[5] According to Federal Rule of Evidence 201, the Court may take judicial notice of facts outside the record that are "not subject to reasonable dispute."  Fed. R. Evid. 201(b).  The Court will take judicial notice *sua sponte* that the USDA recommended daily allowance for calorie intake for men of moderate activity and of Porter's age is 2400-2600 calories.  *See* USDA Dietary Guidelines for Americans 2010, https://www.dietaryguidelines.gov (last visited March 28, 2022).

4

aware of Plaintiff's allegations regarding his need for a special diet. Doc. [95-1] ¶ 65, ¶ 74. However, Porter did not provide the Jail with any medical diagnosis or medical confirmation of his need for a special diet, and there is no evidence in the record of his need for extra calories, other than Plaintiff's assertion of the same.

On June 12, 2017, Plaintiff complained to Defendant Stevens that his food tray was shorted, and requested side dishes to supplement his main dish in order to accommodate his special, high calorie diet. Doc. [88], at 13 ¶ 2. Stevens told Porter that he would not receive extra food, and directed him back to his bunk. *Id*. ¶ 3. Porter showed Stevens his food tray through the window, so that Stevens could see that he did not have enough food. Doc. [95-1] ¶ 67. Stevens told Porter that if the tray was missing food, that was "probably not how it came in there." *Id*. ¶ 68. Porter explained to Stevens that he had not eaten any of the food prior to complaining. *Id*. ¶ 69. Porter submitted an inmate grievance form on June 12, 2017, describing his special diet and the ways he purportedly suffers if denied extra calories per day. *Id*. ¶ 77. Defendant Stevens provided a response to the form, stating that he had been informed that there was no medical reason to provide Porter with extra food, and that Porter was receiving the same amount of calories as other inmates.[6] *Id*. ¶ 78. Porter does not dispute that he was served food while incarcerated at the Jail, but maintains that he did not receive enough food to accommodate his special dietary needs. Doc. [88] ¶ 5. Porter was informed that the Jail found no medical reason for him to receive extra food, and accordingly, he would receive the same amount as other inmates. *Id*. ¶ 6. On June 5, 2017, when Porter was admitted to the Jail, he weighed approximately 156 pounds. *Id*. ¶ 7. When he was transferred from the Jail to the Greene County Department of Corrections on December 29, 2017, he weighed 145 pounds. *Id*. ¶ 8. The Greene County records state that "Porter had neither weight loss nor weight gain, when compared to previous records" and that Porter was "in a good general state of health." *Id*. ¶ 9.

Defendants filed the instant Motion for Summary Judgment on Plaintiff's Amended Complaint on March 8, 2021, claiming that Plaintiff has failed to establish that Defendants have violated Porter's constitutional or statutory rights, and they are entitled to qualified immunity on his claims.

---

[6] The Amendment to Food Services Agreement between the Jail and Trinity Services Group, Inc., (the Jail's food services provider) indicates that the price charged for meals provided under the agreement is based upon a 3000-calorie per day menu with a fortified drink at dinner. *See* Doc. [88-10] at 1-2.

5

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, a court must grant a motion for summary judgment if it finds, based on the factual record, that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Material facts are those that "might affect the outcome of the suit under the governing law," and there is a genuine dispute where "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323 (quotation marks omitted). The burden then shifts to the non-movant to "present specific evidence, beyond 'mere denials or allegations [that] . . . raise a genuine issue for trial.'" *Farver v. McCarthy*, 931 F.3d 808, 811 (8th Cir. 2019) (quoting *Wingate v. Gage Cnty. Sch. Dist., No. 34*, 528 F.3d 1074, 1079 (8th Cir. 2008)).

Motions for summary judgment in qualified immunity cases are "unique in that the court should not deny summary judgment any time a material issue of fact remains on the constitutional violation claim . . . ." *Jones v. McNeese*, 675 F.3d 1158, 1161 (8th Cir. 2012) (quoting *Brockinton v. City of Sherwood, Ark.*, 503 F.3d 667, 671 (8th Cir. 2007)) (cleaned up). Because qualified immunity "is an immunity from suit rather than a mere defense to liability[,]… it is effectively lost if a case is erroneously permitted to go to trial. *Id.* (citing *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985)). Therefore, in a qualified immunity case, the court must "take a careful look at the record, determine which facts are genuinely disputed, and then view those facts in a light most favorable to the non-moving party so long as those facts are not so blatantly contradicted by the record that no reasonable jury could believe them." *Id.* at 1161-62 (quoting *O'Neil v. City of Iowa City, Iowa*, 496 F.3d 915, 917 (8th Cir. 2007)) (cleaned up).

## DISCUSSION

### I. Section 1983 and Qualified Immunity

Section 1983 of Title 42 of the United States Code imposes civil liability upon one:

> who, under the color of any statute, ordinance, regulation, custom, or usage, of any State. . . subjects, or causes to be subjected, any citizen of the United States. . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws.

42 U.S.C. § 1983. "Section 1983 is not itself a source of substantive rights," but affords "a method for vindicating federal rights elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quotation marks omitted) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 (1979)). Thus, in considering a Section 1983 claim, a court must "identify the specific constitutional right infringed." *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 394 (1989)).

"Qualified immunity shields government officials from liability in a § 1983 action unless their conduct violates a clearly established right of which a reasonable official would have known." *Burnikel v. Fong*, 886 F.3d 706, 709 (8th Cir. 2018) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). This standard "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Walker v. City of Pine Bluff*, 414 F.3d 989, 992 (8th Cir. 2005) (quoting *Hunter v. Bryant*, 502 U.S. 224, 229 (1991).

To determine whether an official is entitled to qualified immunity, the Court asks the following two-part question: "(1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether the right at issue was clearly established at the time of the defendant's alleged misconduct." *Morgan v. Robinson*, 920 F.3d 521, 523 (8th Cir. 2019) (en banc) (quoting *Nord v. Walsh Cnty.*, 757 F.3d 734, 738 (8th Cir. 2014)). The Court may decide which determination to make first, *Pearson v. Callahan*, 555 U.S. 223, 235-36 (2009), and "the defendants are entitled to qualified immunity unless the answer to both of these questions is yes." *McCaster v. Clausen*, 684 F.3d 740, 746 (8th Cir. 2012).

Although "[q]ualified immunity is an affirmative defense for which the defendant carries the burden of proof," the "plaintiff . . . must demonstrate that the law is clearly established." *Sparr v. Ward*, 306 F.3d 589, 593 (8th Cir. 2002) (citing *Johnson-El v. Schoemehl*, 878 F.2d 1043, 1048 (8th Cir. 1989)). "A right is clearly established only where it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8 (2021) (per curiam) (quoting *Mullenix v. Luna*, 577

U.S. 7, 11 (2015)) (per curiam).  Although case law directly on point is not necessary to demonstrate that a right is clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* at 7-8 (citing *White v. Pauly*, 137 S. Ct. 548, 551 (2017)).  The Supreme Court has continued to reiterate in recent decisions that clearly established rights "should not be defined at a high level of generality." *White*, 137 S. Ct. at 552 (quotation marks omitted) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)).  Rather, "the clearly established law must be 'particularized' to the facts of the case." *Id*. (quoting *Anderson v. Creighton,* 483 U.S. 635, 640 (1987)).

## II. Excessive Force and Failure to Intervene Claims in Count I

In Count I of his Amended Complaint, Porter alleges that Defendant Stevens violated his civil rights pursuant to 42 U.S.C. § 1983 when he used excessive force against him during the first June 12, 2017, incident described above.  He further alleges that Defendant Crites violated his civil rights under Section 1983 by standing by and failing to intervene in the matter.  Defendants argue that Stevens's actions did not constitute excessive force pursuant to Section 1983, as the use of force was objectively reasonable in light of the circumstances, and consequently, Crites did not fail to intervene, as intervention was unnecessary.  Consequently, they argue, they are both entitled to qualified immunity on Count I.  Alternatively, Defendants argue that, even if the Court finds a question of fact with regard to the amount of force used, they are nonetheless entitled to qualified immunity because, under established law, the use of force in this case could not reasonably be classified as clearly impermissible.  Plaintiff opposes summary judgment on the ground that the force used was objectively unreasonable and violated his clearly established right to be free from excessive force.

The Due Process Clause of the Fourteenth Amendment protects pretrial detainees[7] from the use of excessive force amounting to punishment. *Kingsley v. Hendrickson*, 576 U.S. 389, 397-98  (2015); *see also Bell v. Wolfish*, 441 U.S. 520, 535 (1979) ("under the Due Process

---

[7] *See Smith v. Conway Cty., Ark*., 759 F.3d 853, 858 (8th Cir. 2014) (citations omitted) (quoting *Walton v. Dawson,* 752 F.3d 1109, 1116-17 (8th Cir. 2014); *Edwards v. Byrd,* 750 F.3d 728, 732 n.2 (8th Cir. 2014)) ("Although 'the Eighth Amendment has no application' until there has been a 'formal adjudication of guilt,' the Fourteenth Amendment gives state pretrial detainees—just as the Fifth Amendment gives federal pretrial detainees—rights which are 'at least as great as the Eighth Amendment protections available to a convicted prisoner.'  Conduct constituting 'cruel and unusual punishment' *a fortiori* constitutes punishment.  And the Due Process Clause prohibits *any* punishment of a pretrial detainee, be that punishment cruel-and-unusual or not.").

Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law"); and *Smith,*, 759 F.3d at 858  ("the Due Process Clause prohibits *any* punishment of a pretrial detainee, be that punishment cruel-and-unusual or not").  Analysis of excessive force claims under the Due Process Clause focuses on whether the defendant's purpose in using force was "to injure, punish, or discipline the detainee." *Edwards*,750 F.3d at 732.

In *Kingsley v. Hendrickson*, 576 U.S. at 398, the Supreme Court rejected analysis of a defendant's subjective state of mind in excessive force cases and concluded "the appropriate standard for a pretrial detainee's excessive force claim is solely an objective one." *See Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1069-71 (9th Cir. 2016) (en banc).  Therefore, the Court must analyze the excessive force claims of pretrial detainees under an objective reasonableness standard. *Kingsley*, 576 U.S. at 397.  Whether the application of force is unreasonable "turns on the 'facts and circumstances of each particular case.'" *Id*. (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).  The Court must assess the actions of each officer "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Id*.  "Officers facing disturbances 'are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving.'" *Id.* at 399 (quoting *Graham,* 490 U.S., at 397).  "For these reasons, we have stressed that a court must judge the reasonableness of the force used from the perspective and with the knowledge of the defendant officer." *Id*.

"A court must also account for the 'legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained,' appropriately deferring to 'policies and practices that in th[e] judgment' of jail officials 'are needed to preserve internal order and discipline and to maintain institutional security.'" *Id*. (quoting *Bell*, 441 U.S. at 547). Factors relevant to assessing the objective reasonableness of force used by officers include:  "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Id*. (citing *Graham* 490 U.S. at 396).  Furthermore, as explained above, an officer enjoys qualified immunity and is not liable for excessive force unless he violated a "clearly established right, such that it would [have been] clear to a

9

reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001).

Defendants argue that the circumstances here are similar to those confronting the court in *Hollingsworth v. City of St. Ann*, 800 F.3d 985, 988 (8th Cir. 2015). In that case, the plaintiff was arrested after stealing wine coolers. *Id*. Once in jail, she was directed to change into a jumpsuit, but she refused. *Id*. The officer twice ordered her to change into the jumpsuit, warning that he would deploy his taser if Hollingsworth failed to don the jumpsuit. *Id*. When she continued to refuse to change, the officer tased her, and one barb went into her chest and the other into her shoulder. *Id*. The officer also touched her inner thigh with the taser. *Id*. After the first tasing, the officer again told Hollingsworth to change into the jumpsuit, and she refused. *Id*. The officer then tased her again for five seconds. *Id*.

Hollingsworth sued the officer for excessive force, and the Eighth Circuit concluded that it was not unreasonable to use some force in light of the plaintiff's repeated refusals to change into the jumpsuit. *Id*. at 990. The Court went on to find that it was not clearly established that an officer's use of a taser, resulting in de minimis injury, was an unconstitutional use of force, and the officer was entitled to qualified immunity on the claim. *Id*. at 990-91.

Plaintiff argues that *Hollingsworth* is distinguishable from this case because the plaintiff in *Hollingsworth* refused to follow the directive to change out of her street clothes, and such refusal of orders is "entirely absent from the case at hand." Doc. [87] at 9. The Court disagrees. In this case, Officer Stevens ordered Porter to enter the cell behind him, and Porter refused. *See* Doc. [88] ¶ 18. Stevens told him again to go in the room behind him, and Porter again refused. Plaintiff denies that he refused to go into the room as ordered. *See* Doc. [88] ¶23. However, in Plaintiff's deposition, Porter, referring to this interaction with Stevens, testified that, "I told him just flat out . . . I'm not going in that room." Doc. [85-2] at 35. Porter further testified that he never went into the cell. *Id*. at 42. The fact that Plaintiff offered a reason for not going into the room (viz., that he purportedly required the already-occupied bottom bunk) does not change the fact that he refused to enter the room as ordered. Stevens told Porter that if he again refused to enter the cell, he would be considered to be refusing an order. *Id*. ¶ 23. Stevens then warned Porter that he would be tased if he refused to enter the cell. *Id*. ¶ 24. Porter instead continued to argue about why he did not want to go into the cell. *Id*. ¶ 25. Stevens then deployed his taser on Porter. *Id*.

10

Defendants direct the Court's attention to the Jail's policy manual, which states that in "situations where the suspect will not follow verbal direction . . . or is actively resisting, the use of the [taser] will prevent many of these situations from escalating to higher levels, including deadly force." *Id*. ¶ 29. The force levels described in the manual progress from an officer's presence, to verbal command, to use of taser, to hand tactics, then impact weapons, and finally, deadly force. *Id*. ¶ 31. Defendants assert that Stevens's use of the taser was both objectively reasonable and in compliance with the Jail's policy. Defendants argue that, like in *Hollingsworth*, Porter was repeatedly given directives by Stevens, which he refused to follow. Additionally, Porter is considerably taller than Stevens, with a known history of aggression and impulsive behavior. Defendants assert that a reasonable officer in a similar position, outnumbered by inmates within his control, who is facing an admittedly "rambunctious" and aggressive inmate who repeatedly fails to respond to direct orders to go into a cell, would find the use of a taser to be a reasonable use of force.

Upon assessing the actions of Officer Stevens "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight," *Kingsley*, 576 U.S. at 397, the Court concludes that Stevens's actions did not constitute excessive force pursuant to § 1983, as the use of force was objectively reasonable in light of the circumstances. Accordingly, Officer Stevens is entitled to qualified immunity on Count I. Additionally, because objectively reasonable force was used and a constitutional violation did not occur, Defendant Crites's intervention was not necessary; therefore, he did not fail to intervene, and he too is entitled to qualified immunity on Count I. *See Hollingsworth*, 800 F. 3d at 991 (officer cannot be liable for failure to intervene where his fellow officer did not violate the plaintiff's constitutional rights by use of a taser).

### III.   Excessive Force Claim in Count II

Plaintiff's claim against Defendant Crites in Count II for unreasonable use of excessive force is also based on events that occurred on June 12, 2017. After being released from Administrative Segregation, Porter engaged in an altercation involving two other inmates, in which he punched the other inmates. Doc. [88] ¶¶ 35-36. Officer Crites broke up the fight and removed Porter from the pod; as they were walking away from the fight, Porter repeatedly twisted around to try to talk to Crites about what has happened. *Id*. ¶ 39. Crites told Porter twice to stop turning and resisting, and when they reached the door to the visitation area, Crites pinned

11

Porter against the door to hold him still. *Id*. ¶ 40. Following the incident, Porter had a chipped tooth and bloody mouth. Doc [95-1] at ¶¶ 41-42.

After Plaintiff was removed from the situation, it was quickly determined that Porter did not start the fight, just as he had protested to Officer Crites while being removed from the scene. *Id*. ¶ 47. However, under *Kingsley*, 576 U.S. at 397, the Court must appraise the situation from the perspective of an officer on the scene, considering what he knew in that moment, and not what became known later. When Officer Crites happened upon the altercation, he did not know who started the fight. All he knew was that there was an ongoing, multi-inmate fist fight involving Plaintiff, who had already spent time in Administrative Segregation due to misbehavior earlier in the day.

Additionally, Porter asserts that his chipped tooth and bloody mouth were the result of Officer Crites's actions, and that such injury indicates an unreasonable amount of force was used. Defendants maintain that the injuries were the result of the fist fight with the other inmates. That disputed fact is not material, as it does not change the Court's analysis of the situation. The injury resulting from an incident is but one of the multiple factors the Court may consider under *Kingsley* when determining whether the use of force was reasonable or not. *Id*. (non-exclusive list of factors relevant to assessing the objective reasonableness of force used by officers include: "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting").

Here, even if Porter's chipped tooth and bloody lip were the result of Crites's actions, the Court determines that the force used by Crites was objectively reasonable given the situation. It is uncontested that Porter was involved in an altercation with two other inmates, in which Porter punched the other detainees. It is further uncontested that Porter continued to twist and turn in an attempt to talk to Crites as he was being removed from the scene of the fight, and that Porter's efforts to turn around, despite being told to desist, prompted Crites to pin Porter against the door to keep him still. Porter was an inmate with known aggression problems who was still agitated by the fight from which he had been removed only moments before, and this was the second incident of the day in which he refused to follow directives given by an officer at the Jail. Porter may have had good reason to attempt to explain the situation to Crites, as Porter had been

attacked by the other inmates, and undoubtedly felt that it was wrong of Crites to assume he was the aggressor. However, the Court must analyze the situation from the perspective of a reasonable officer armed with only the knowledge he had in that moment. The force used by Crites was reasonable as an effort to gain control of a rapidly escalating situation. As the Supreme Court noted in *Kingsley*, "[o]fficers facing disturbances 'are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving.'" *Id*. (quoting *Graham,* 490 U.S. at 397). The Court concludes, then, that Officer Crites is entitled to qualified immunity on Count II of Porter's Amended Complaint.

## IV.     Excessive Force Claim in Count III

Plaintiff's claim against Defendant Colyer in Count III for unreasonable use of excessive force is based on events that occurred on October 28, 2017. The Court will evaluate this claim according to the same standard articulated above to determine whether Colyer's use of force was objectively reasonable in light of the facts and circumstances known to him at the time.

Plaintiff alleges that on the day in question, he was served a piece of undercooked meat. Doc. [88] ¶ 43. Porter complained about the meat to one of the corrections officers, who asked Porter to come out of his pod to discuss it, and Porter walked out of his pod. Doc. [95-1] ¶ 48-49. Officer Golden saw Porter walk out of the pod, and, not knowing that Porter had been asked to exit the pod, believed that Porter had exited the pod without permission. *Id*. ¶ 50. Officer Golden believed that Porter was "trying to escape," and attempted to grab Porter's arm to handcuff him. Doc. [88] ¶¶ 45-46. Defendant Colyer witnessed this interaction from the observation bubble, and came to assist, as he believed that Porter was refusing an order from Officer Golden. *Id*. ¶ 47. Officer Golden told Porter that he was taking him to booking for exiting the pod without permission. *Id*. ¶ 48. As Golden and Porter were walking to booking, Porter leaned back in an attempt to say something about where he was being taken. *Id*. ¶ 49. Seeing this interaction, and still under the impression that Porter was resisting Golden, Colyer grabbed Porter and told him to stop resisting Golden. *Id*. ¶ 50. Colyer then twice directed Porter to stop resisting, indicating that if he continued to struggle, Colyer would tase him. *Id*. ¶ 51. Colyer then placed Porter on the ground, unholstered his taser, and tased Porter. *Id*. ¶ 52.

Defendants argue that this incident is similar to the situation described in *Hollingsworth*, 800 F.3d at 988, as Porter was repeatedly given a directive, he refused to adhere to Colyer's verbal requests to stop resisting, and such resistance justified the use of greater force, including

13

tasing.  Plaintiff argues that he was not resisting, but was merely leaning back in an effort to talk to another officer in order to ask where he was being taken, and that no use of force whatsoever was justified in that situation.  Doc. [87] at 20.  It does appear that both Golden and Colyer were mistaken in their belief that Porter had exited his pod without permission and was trying to escape.  Nonetheless, as explained *supra*, this Court "must judge the reasonableness of the force used from the perspective and with the knowledge of the defendant officer."  *Kingsley*, 576 U.S. at 399.  In that sense, the situation is similar to the incident described in Count II, where Plaintiff knew that he did not initiate the altercation with the other inmates, and was struggling to relay that information, while the officers merely perceived him to be struggling as he was removed from the scene of the fight.  In this situation, like that in Count II, when analyzed from the perspective of a reasonable officer armed only with the knowledge he had at that time, the use of force in that moment appears objectively reasonable.  And, as further discussed below, even assuming arguendo that the force used was not reasonable, qualified immunity nonetheless shields Colyer from liability.

   The Court acknowledges that the incident in Count III is a closer call than the incident described in Count II.  Slamming Porter to the floor to administer his taser, when a lesser use of force may have been sufficient, does give the Court pause.  However, the Supreme Court has admonished that a district court must account for the "'legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained,' appropriately deferring to 'policies and practices that in th[e] judgment' of jail officials 'are needed to preserve internal order and discipline and to maintain institutional security.'"  *Id.* at 399 (quoting *Bell*, 441 U.S. at 547).  Furthermore, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights."  *Jones v. Crews*, 2020 WL 1433638, at *7 (E.D. Mo. Mar. 24, 2020) (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)).

   Excessive force cases are all somewhat different, and the analysis is exceedingly fact specific.  *See Kingsley*, 576 U.S. at 397 (whether the application of force is unreasonable turns on the facts and circumstances of each particular case).  However, even if Colyer's actions were excessive, when it is not entirely clear whether an officer's actions were permissible or not, qualified immunity operates to "protect officers from the sometimes 'hazy border between excessive and acceptable force.'"  *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (quoting

14

*Saucier v. Katz*, 533 U.S. 194, 206 (2001)).  Here, Plaintiff has identified no case that places Colyer's conduct squarely beyond what he may reasonably have believed acceptable in the circumstances.  "Qualified immunity shields an officer from suit when [ ]he makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances [ ]he confronted."  *Id*.  Therefore, the Court concludes that Colyer is entitled to qualified immunity on Count III.

## V.      Inadequate Nutrition Claim in Count IV

In Count IV, Porter alleges that on June 12, 2017, his food tray was shortened, and when he complained to Defendant Stevens, Stevens refused to give him any additional food, even though Porter had notified the Jail of his need for extra calories.  Consequently, Porter asserts, Defendant Stevens deprived him of nutritionally and calorically adequate food by refusing to provide him with enough food to accommodate his dietary needs.[8]  He further alleges that, as a result, he suffered physical pain, weight loss, and mental anguish.  Porter also alleges that during his time at the Jail, he did not consistently receive the minimum, daily caloric intake required by law, but he does not implicate Stevens in this general denial of adequate nutrition.  Rather, Porter blames Stevens only for the June 12, 2017, denial of additional food.

Pre-trial detainees, like all prisoners, have a right to nutritionally adequate food.  *Wishon v. Gammon*, 978 F.2d 446, 449 (8th Cir. 1992);*see also Burgin v. Nix*, 899 F.2d 733, 734 (8th Cir. 1990) (citing *Campbell v. Cauthron*, 623 F.2d 503, 505 (8th Cir. 1980)) ("One constitutional protection retained by the prisoner is the right to an adequate diet.").  A prisoner's mere dissatisfaction with his menu is insufficient to state a constitutional violation.  *Dale v. Kaemingk*, 2016 WL 11407820, at *11 (D.S.D. May 25, 2016), *report and recommendation adopted*, 2016 WL 6915268 (D.S.D. Nov. 23, 2016).  While control of the diet is within the discretion of prison officials, the diet must be adequate.  *Divers v. Dep't of Corrs.*, 921 F.2d 191, 194 (8th Cir. 1990).

---

[8]  Porter also alleges that he attempted to submit multiple grievances to the Jail regarding his alleged need for extra food, but that Stevens shredded them.  *See* Doc. [74] at 8.  However, several grievances on this subject were submitted to the Jail and are in the record in this matter.  *See* Docs. [85-3], [87-8], and [88-8].  And Porter has submitted no evidence that Stevens did in fact thwart his attempts to complain about his alleged lack of adequate nutrition.  *See Mehrkens v. Blank*, 556 F.3d 865, 868–69 (8th Cir. 2009) ("A party opposing summary judgment may not rest upon mere allegations or denials contained in the pleadings, but must, by sworn affidavits and other evidence, set forth specific facts showing that there is a genuine issue for trial."); *see also* Fed. R. Civ. P. 56(e).  The Court will not, then, consider this allegation against Stevens when analyzing Count IV.

A plaintiff can demonstrate that his right to an adequate diet was violated by evidence that (1) the food he was served was nutritionally inadequate, or (2) prepared in a manner presenting an immediate danger to his health, or (3) that his health suffered as a result of the food. *Ingrassia v. Schafer*, 825 F.3d 891, 897 (8th Cir. 2016). To demonstrate a constitutional violation, Porter must show that Stevens was deliberately indifferent to his nutritional needs, that is, Stevens "failed to act despite . . . knowledge of a substantial risk of serious harm." *See Farmer v. Brennan*, 511 U.S. 825, 842, (1994).

Defendants do not dispute that inmates are entitled to a nutritionally adequate diet. However, they maintain that Plaintiff has failed to show that that he was served nutritionally inadequate food, that his food that was prepared in a manner presenting immediate danger to his health, or that his health suffered as a result of the food he was served. Doc. [94] at 12-13. Defendants further assert that, in order to constitute an objectively serious medical need for additional food, Plaintiff's need for extra calories must be either obvious to a layperson or supported by medical evidence. Defendants claim that Plaintiff has failed to provide any proof of a legitimate medical need for extra calories, and that his alleged need for additional food would not be obvious to a layperson like Stevens. An institution such as a jail cannot operate effectively, they argue, if it must accept every inmate's demand for more or different food in the absence of medical necessity. For these reasons, they argue that Porter' claim fails as a matter of law, and Stevens is entitled to qualified immunity on Count IV. The Court agrees.

Porter does not base his inadequate-nutrition claim on receiving *no* meals, but rather that the replacement meals were calorically inadequate due to his special dietary needs. There is no evidence in the record showing how many calories he was receiving per day, on average, aside from his own deposition testimony that the Jail "give[s] you a 2,000 calorie diet [which] is the minimum that's needed." Doc. [88-1] at 95:12-16. Additionally, the Amendment to Food Services Agreement between the Jail and Trinity Services Group, Inc., (the Jail's food services provider) indicates that the price charged for meals provided under the agreement is based upon a 3000-calorie menu per inmate each day. *See* Doc. [88-10] at 1-2.

Furthermore, Porter has provided nothing beyond his bare assertions that he has a medical need for between 4,000 and 6,000 calories per day. Porter, in his response to Defendants' Statement of Material Facts, asserts that he has a medical need for extra food, but his citation to the record does not support this assertion. *See* Doc. [88] ¶ 6. Porter cites to

16

Exhibit 2 to his Memorandum in Opposition to Defendants' Motion for Summary Judgment, but Exhibit 2 is merely his medical history form for the Jail, filled out by Porter on June 3, 2017, which alleges that his food trays must be "at least double" the normal amount. Doc. [87-2]. The Eighth Circuit has stated that it will not accept an inmate's bare assertion of a medical condition without medical evidence verifying that the condition exists. *Aswegan v. Henry*, 49 F.3d 461, 465 (8th Cir. 1995); *see also Aldridge v. Hill*, 2022 WL 503719, at *5 (E.D. Mo. Feb. 18, 2022) (quoting *Kayser v. Caspari*, 16 F.3d 280, 281 (8th Cir. 1994)) ("Plaintiff's 'bare assertion[s] are insufficient to demonstrate that he had objectively serious medical needs."). When Porter submitted an Inmate Request Form on June 12, 2017, asserting that he required a supplemented diet, he was advised that there was no medical reason for him to obtain additional calories. Doc. [88] ¶ 6. A reasonable officer, evaluating Porter's request for additional food on June 12, 2017, would have no reason to believe that Porter's bare assertion that he required 4,000 to 6,000 calories per day was in fact a medical necessity, and not simply a request for additional food.

Furthermore, Porter has provided no evidence that his health was harmed by inadequate nutrition while at the Jail. He alleges only moderate weight loss and no other related health problems. On June 5, 2017, when Porter was admitted to the Jail, he weighed approximately 156 pounds. *Id*. ¶ 7. When he was transferred from the Jail to the Greene County Department of Corrections on December 29, 2017, he weighed 145 pounds. *Id*. ¶ 8. Greene County records state that upon admission to their facility "Porter had neither weight loss nor weight gain, when compared to previous records" and was "in a good general state of health." *Id*. ¶ 9.

The Court finds that Porter's claim in Count IV fails as a matter of law, as he has not met the three-part test set forth in *Ingrassia*, 825 F.3d at 897. More specifically, Porter has not shown that (1) the food he was served was nutritionally inadequate, (2) that it was prepared in a manner presenting an immediate danger to his health, or (3) that his health suffered as a result of the food. Defendant Stevens is thus entitled to qualified immunity on Count IV.

## VI.    *Monell* Claim in Count V

In Count V, Porter sues Cape Girardeau County under 42 U.S.C. § 1983, alleging that it had a policy and practice of supporting the widespread practice of unreasonable use of force, and that the practice was the result of inadequate training of Jail employees. *See* Doc. [74] ¶¶ 81-97.

"A local governing body such as [Cape Girardeau] County can be sued directly under 42 U.S.C. § 1983." *Esparza v, Manley*, 2019 WL 4643993, at *3 (E.D.Mo. Sep. 24, 2019) (citing

*Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978)); *see also Los Angeles Cty., Cal. v. Humphries*, 562 U.S. 29 (applying § 1983 liability to a county). But a county may be liable under § 1983 only where the constitutional violation was "committed pursuant to an official custom, policy, or practice" or was "so pervasive among non-policymaking employees as to constitute a custom or usage without the force of law." *Agnew v. St. Louis City*, 504 F. Supp. 3d 989, 1003 (E.D. Mo. 2020) (cleaned up) (quoting *Granda v. City of St. Louis*, 472 F.3d 565, 568 (8th Cir. 2007)).

In order for municipal liability to attach, individual liability first must be found on an underlying substantive claim. See *Abbott v. City of Crocker*, 30 F.3d 994, 998 (8th Cir. 1994); *accord McCoy v. City of Monticello*, 411 F.3d 920, 922 (8th Cir. 2005). Porter has not created a dispute of material fact as to the underlying claims against the individual Defendants, and the Court has granted them judgment as a matter of law. Therefore, Cape Girardeau County cannot be held liable on a policy and practice or failure-to-train theory. *See McCoy*, 411 F.3d at 922 (summary judgment for defendant officer on excessive-force claim precluded City from liability on an unconstitutional policy or custom theory or failure-to-train theory). As such, the Court will grant Defendants' Motion with respect to Porter's *Monell* claim against the County.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (Doc. [84]) is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendants Motion to Stay (Doc. [83]) is **DENIED** as moot.

A separate Judgment shall accompany this Memorandum and Order.

Dated this 31st day of March, 2022.

*[signature]*

SARAH E. PITLYK
UNITED STATES DISTRICT JUDGE